**SACO–LOWELL SHOPS et al. v. REYNOLDS et al.**

**No. 5186.**

Circuit Court of Appeals, Fourth Circuit.

March 13, 1944.

Hugh D. McLellan and Hector M. Holmes, both of Boston, Mass. (Julius C. Smith, of Greensboro, N. C., and Fish, Richardson & Neave, of Boston, Mass., on the brief), for appellants.

John M. Robinson and Frank H. Kennedy, both of Charlotte, N. C. (Hunter M. Jones, of Charlotte, N. C., and E. O. Ayscue, of Monroe, N. C., on the brief), for appellees.

Before PARKER, SOPER, and DOBIE, Circuit Judges.

PARKER, Circuit Judge.

This is an appeal from a decree in a suit to recover royalties under a contract. licensing the manufacture of patented machinery and to enforce equities arising out of the confidential relationship existing between the parties to that contract. The plaintiffs are W. G. Reynolds, the inventor of an improved process of cotton roving and an improved cotton roving frame, covered by patents Nos. 1,738,796 and 2,238,-659, and E. A. Terrell and the Terrell Machine Company, assignees of an interest in these patents. The defendant is the Saco-Lowell Shops, a corporation that holds a license from plaintiffs for the manufacture of machinery covered by the patents and that has admittedly paid plaintiffs royalties in excess of $100,000 on such machinery. The questions in the case are whether certain model J roving frames manufactured by defendant are subject to royalties under the licensing contract and whether plaintiffs are in equity entitled to a roving machine patent obtained by defendant through an employee named Jones but embodying ideas of plaintiff Reynolds communicated to defendant in the course of a confidential relationship. The District Court answered both questions in favor of plaintiffs, granting a recovery of $185,801.11 and interest on account of royalties and directing that defendant assign the Jones patent No. 2,187,830 to plaintiffs. From this decree defendant has appealed.

The questions involved in the appeal are very largely questions of fact and the learned trial judge has given them thorough consideration, hearing testimony with regard thereto for two weeks or more, witnessing the operation of the machines in controversy and finding the facts in detail in 49 separately numbered findings. These findings are binding upon us except to the extent that we are prepared to hold that they are clearly wrong, Rules of Civil Procedure rule 52, 28 U.S.C.A. following section 723c; and they are not weakened or discredited because made by the trial judge in the form requested by counsel. The judge very properly requested counsel for both sides to present their requests for findings in a form which, if approved, could be adopted by the court; counsel for both sides complied with this request; and the opinion filed by the judge shows that he gave careful thought to the questions involved so that the findings adopted embody his well considered views. While the defendant objects to a number of matters embraced in the findings, it does not discuss the findings specifically. A careful con-

sideration of the testimony convinces us that they ought not be disturbed.

The facts necessary to an understanding of the case may be summarized as follows: The invention of Reynolds relates to what is known as the "roving" of cotton fibre in preparation for spinning into cotton yarn. The roving process consists in taking a strand of cotton fibres called a "sliver" and submitting it to pulling or "drafting", as a result of which the sliver is lengthened and attenuated and the fibres of cotton are drawn parallel to each other. Drafting is accomplished by passing the sliver between two pairs of rolls in succession, the second pair operating at a greater rate of speed than the first. The ordinary roving process prior to the invention of Reynolds required three or more distinct drafts; and it was necessary to reform the sliver between drafts by twisting it on a bobbin, so that as many roving frames were required as there were drafts of the sliver.

Reynolds conceived the idea of performing a series of drafts upon a single machine by reforming the sliver without twisting between drafts. He devised a machine, covered by patent No. 1,738,796, which was to reform the sliver between drafts by a folding process accomplished by the use of rollers having a tongue and groove engagement. These tongue and groove rollers not only reformed the sliver by folding after the first draft but also held it against a second draft made by the succeeding pair of rollers which operated at a greater rate of speed than they. The machine of this first patent was not satisfactory, however, and Reynolds improved it by providing that the folding rollers with the tongue and groove should be on a plane slightly lower than the rollers effecting the preceding draft and should be operated at a slightly advanced rate of speed so as to take up any slackness in the sliver due to the folding operation. The effect of the lowering of the tongue and groove rollers was to hold the sliver in tension, first against the surface of the rollers from which it was coming and then against the surface of the groove of the folding roller into which it was entering. The machine with these improvements worked satisfactorily. It embodied three concepts: (1) Reforming the sliver between drafts by a folding process, (2) holding the fibres from vertical and transverse expansion between the drafts by causing the sliver to travel under tension against surfaces, and (3) using a difference in speed, or take up, to eliminate fullness due to folding.

After Reynolds had built a machine of the improved character heretofore described and had placed it in successful operation, the defendant, one of the leading manufacturers of textile machinery in the United States, approached him and proposed that he license the manufacture of the machine by defendant and that he himself enter the service of defendant and work toward perfecting the machine for commercial production. Reynolds agreed to this and spent goodly portions of the years 1933 and 1934 working in defendant's plant with other employees of defendant's experimental department. During this period patent attorneys for defendant cooperated with patent attorneys for plaintiffs in making application for a patent on the improved machine. Application for the patent was filed in July 1934 and the patent, No. 2,238,659, was issued in April 1941.

In the meantime a license agreement had been signed between the parties on December 28, 1933. This license covered not merely rights under the patents then held by plaintiffs, but rights in any future patents that might issue on the Reynolds invention "together with any improvements thereon or relating thereto which either or both of the licensors may have heretofore invented or acquired or may hereafter invent or acquire, whether or not covered by patents, insofar as the licensee may desire to apply the same to machines and/or processes embodying or employing any invention or inventions disclosed and claimed in any of the above named patents and/or in the application for patent above referred to, and/or embodying or employing any improvements upon said invention or inventions." The defendant agreed to pay royalties "on machines embodying any invention covered by any United States patent included or contemplated in this license, and during the pendency of said Reynolds application about to be filed, on machines embodying any invention covered by any claim thereof not finally rejected." There was provision that the defendant as licensee should be under no further obligation to pay royalties on a patent held invalid or not infringed but that the royalties provided for should "be payable on all apparatus embodying the invention of any claim or claims not held invalid." The

licensee was granted the exclusive right to make and sell machines and agreed to use its best endeavors promptly to develop, manufacture and sell devices embodying the invention of Reynolds. Royalties were fixed at 15% with provision that, if necessary to meet competition, plaintiffs would agree to a reduction to 10% and this reduction was subsequently made.

The machine and process of the Reynolds patent undoubtedly marked a great step forward in the art. As said in the opinion of the court below, it "revolutionized roving in textile plants and became a pronounced commercial success. Six men with this patented device could do the work generally requiring eighteen; one machine did the work of two, sometimes three." It was hailed by defendant in its advertising bulletins as being revolutionary in character, the following significant statement with regard thereto appearing in its bulletin of October 1934: "From the first we had realized that this new drafting mechanism is a radical departure from conventional ideas of roving machinery and in the matter of doublings it is a wide-open break with tradition * * *. The facts, as developed in actual mill use, regarding the performance, economy and simplicity of the machine square in every respect with the specifications we had set up as our practical ideal. It provides a unique, simple and effective method of eliminating unnecessary roving operations, and for most organizations makes possible the production of roving for the spinning frames of the required quality and size by a continuous controlled draft, in a single operation." There was immediate and widespread demand for the machine; and, as above stated, royalties of more than $100,-000 were paid to plaintiffs, most of these from orders received prior to 1937.

In May 1934, while Reynolds was still working on the machine of his invention with the draftsmen and engineers of defendant, he conceived the idea that the folding device of the machine might be made stationary and communicated this idea to the employees of defendant with whom he was working and caused it to be inserted in the specification of the patent for which application was made. His thought at first was that a stationary grooved folding block could be substituted for the grooved roll, and a successful experiment in which such folding block was used in connection with the tongued roll was made in defendant's experimental department. He discussed with one of defendant's engineers with whom he was working the advisability of using the folding block without the tongued roll engaging it, but with an ordinary pair of rollers so placed as to engage the sliver immediately after it passed through the folding block. In 1937, after Reynolds had left defendant's service, defendant secured through Jones, one of its engineers, a patent on a machine of this character and began manufacturing it without notice of any sort to plaintiffs. On seeing it, plaintiffs asked in their patent application, which was still pending, that they be allowed claims broad enough to cover the process and mechanism involved. An interference proceeding was initiated by the Patent Office and priority on the four claims involved in this proceeding was awarded plaintiff, although three of the claims were subsequently disallowed. Three additional claims were then filed and allowed, and these, as we shall point out hereafter, fully cover the J frames of defendant's manufacture.

Finding No. 29 of the court below, which is amply sustained by the evidence, thus summarizes the situation with respect to defendant's development of the J frames:

"29. The J frames were based upon knowledge obtained by the defendant from the plaintiff, Reynolds, while the said parties were working together under the terms of the license agreement, said information being divulged to the defendant with the understanding and agreement that it would be used, if used at all, for the joint benefit of the parties, their respective rights being set out in the license agreement. The defendant undertook to take advantage of the confidence so reposed in it and to appropriate the knowledge so obtained to its own exclusive benefit and, pursuant to such undertaking, attempted to defeat the rights of the plaintiffs and avoid its obligations to the plaintiffs in three ways: first, by joining with Whiten Machine Works in undertaking to limit the scope of the plaintiff's patent protection; second, by claiming the J frames as an independent development of its own; and, third, by promoting the sale of the J frames to the exclusion of the tongued-and-grooved roll frame. This conduct of the defendant was not in good faith but was pursuant to an effort on its part to avoid its obligations under the contract and to take advantage of the confidence placed in it by the plaintiffs."

Finding No. 30 succinctly points out the difference between the machines admittedly developed under the Reynolds patent, referred to as D frames, and the J frames of the defendant and shows that the component parts of the J frames are the mechanical equivalents of the parts performing corresponding functions in the D frames. That finding is as follows:

"30. The later models of the tongued-and-grooved roll frames have been designated by the defendant as D frames and will be so referred to. For convenience, during the trial, the rolls on the frames demonstrated in court were numbered consecutively designating as No. 1 the last pair of rolls through which the strand passes. The D frames and the J frames all have two drafting stages with a reforming stage between. Each type has four pairs of rolls. The rolls are the same in each frame except pair No. 2. In the J frames, pair No. 2 are plain rolls, while in the D frames the top roll of this pair has a groove, and the bottom roll a corresponding tongue. To take the place of the groove in the top roll of the D frame, the J frames include, between the 2nd and 3rd pairs of rolls, a stationary groove through which the strand is drawn. In each frame, the reforming stage is between the bite of pair of rolls No. 3 and the bite of pair of rolls No. 2. Each frame has in this reforming stage a groove narrower than the strand which begins the reforming operation, which operation is completed in each instance as the strand is nipped at the bite of pair of rolls No. 2. The mechanical difference is that in the D frames the groove is provided as an integral part of the top roll of pair No. 2, while in the J frames the groove is stationary and, therefore, separated from this rotating member. In each instance provision is made for the strand to enter the groove as soon as possible after leaving contact with the preceding rolls. In the D frames this is effected by setting pair of rolls No. 2 upon a lower level than pair of rolls No. 3. In the J frames, particularly the J-3 frames, this same purpose is accomplished by designing the stationary grooved member so that the bottom of the groove sets as close to the bite of pair of rolls No. 3 as possible. Pair of rolls No. 2 in the D frames performs all the functions performed by pair No. 2 in the J frames. In addition thereto, the top grooved roll in the D frames performs the functions performed in the J frames by the stationary reforming member. While there is this mechanical difference in the two frames, the Court finds as a fact that the component parts of the J frames are the mechanical equivalents of the parts performing the corresponding functions in the D frames, and that each of the frames practices the process of the Reynolds patent in substantially the same way."

We think that the decree of the court below, awarding royalties to plaintiffs on the J frames of defendant's manufacture and holding that such machines are within the terms of the license agreement, is correct and is sustainable on any one of three grounds, viz.: (1) The J frames are covered by the claims of plaintiffs' second patent; (2) whether technically covered by the claims of the patent or not, the J frames embody the invention of Reynolds and the payment of royalties is required by the contract; and (3) the idea embodied in the J frames was the idea of Reynolds, was obtained by defendant as a result of the confidential relationship existing between the parties and must be treated as belonging to the invention which they were engaged in developing. We shall discuss these several grounds separately.

1. The Coverage of the Patent.

The difference between the D frame and the J frame, as pointed out above, is that the D frame uses for the folding of the sliver a groove which is made a part of one of the rolls which press the sliver and hold it against the succeeding draft, whereas the J frame places the groove that does the folding immediately before the rolls that press and hold the sliver against the succeeding draft. In the J frame, however, the sliver is held under tension against the surface of the folding block by elevating the forward end of the block above the line of draft of the sliver, there is folding by use of a groove and compression by rolls which hold against the succeeding draft, and there is the use of sufficient take up to eliminate the fullness due to folding. In other words the J frame accomplishes the same result as the D frame in substantially the same way. Even if the Reynolds patent had merely claimed the machine described in the specification and drawings, therefore, we would not hesitate to hold, under the liberal application of the doctrine of equivalents to which a patent which has made so great an improvement in the art is entitled, that the

J frame would be covered by it. The principle applicable is that stated by Mr. Justice Curtis in the leading case of Winans v. Denmead, 15 How. 330, 342, 14 L.Ed. 717, as follows:

"It is only ingenious diversities of form and proportion, presenting the appearance of something unlike the thing patented, which give rise to questions; and the property of inventors would be valueless, if it were enough for the defendant to say, your improvement consisted in a change of form; you describe and claim but one form; I have not taken that, and so have not infringed. The answer is, my improvement did not consist in a change of form, but in the new employment of principles or powers, in a new mode of operation, embodied in a form by means of which a new or better result is produced; it was this which constituted my invention; this you have copied, changing only the form; * * *."

▇▇▇ And the rule was applied and stated with great clarity by Mr. Justice Clifford in Union Paper-Bag Machine Co. v. Murphy, 97 U.S. 120, 125, 24 L.Ed. 935, from which we quote as follows:

"Except where form is of the essence of the invention, it has but little weight in the decision of such an issue, the correct rule being that, in determining the question of infringement, the court or jury, as the case may be, are not to judge about similarities or differences by the names of things but are to look at the machines or their several devices or elements in the light of what they do, or what office or function they perform, and how they perform it, and to find that one thing is substantially the same as another, if it performs substantially the same function in substantially the same way to obtain the same result, always bearing in mind that devices in a patented machine are different in the sense of the patent law when they perform different functions or in a different way, or produce a substantially different result.

"Nor is it safe to give much heed to the fact that the corresponding device in two machines organized to accomplish the same result is different in shape or form the one from the other, as it is necessary in every such investigation to look at the mode of operation or the way the device works, and at the result, as well as at the means by which the result is attained.

"Inquiries of this kind are often attended with difficulty; but if special attention is given to such portions of a given device as really does the work, so as not to give undue importance to other parts of the same which are only used as a convenient mode of constructing the entire device, the difficulty attending the investigation will be greatly diminished, if not entirely overcome. Cahoon v. Ring [Fed.Cas.No.2,292], 1 Cliff. [592], 620.

"Authorities concur that the substantial equivalent of a thing, in the sense of the patent law, is the same as the thing itself; so that if two devices do the same work in substantially the same way, and accomplish substantially the same result, they are the same, even though they differ in name, form, or shape. Curtis, Patents (4th ed.), sec. 310."

And in the comparatively recent case of Sanitary Refrigerator Co. v. Winters, 280 U.S. 30, 41, 50 S.Ct. 9, 12, 74 L.Ed. 147, the Supreme Court, in holding a latch for refrigerator doors infringed by a device which employed the same principle of operation with a slight rearrangement of parts, said:

"There is a substantial identity, constituting infringement, where a device is a copy of the thing described by the patentee, 'either without variation, or with such variations as are consistent with its being in substance the same thing.' Burr v. Duryee, 1 Wall. 531, 573, 17 L.Ed. 650. Except where form is of the essence of the invention, it has little weight in the decision of such an issue; and, generally speaking, one device is an infringement of another 'if it performs substantially the same function in substantially the same way to obtain the same result. * * * Authorities concur that the substantial equivalent of a thing, in the sense of the patent law, is the same as the thing itself; so that if two devices do the same work in substantially the same way, and accomplish substantially the same result, they are the same, even though they differ in name, form, or shape.' Union Paper Bag Machine Co. v. Murphy, 97 U.S. 120, 125, 24 L.Ed. 935. And see Elizabeth v. Pavement Co., 97 U.S. 126, 137, 24 L.Ed. 1000. That mere colorable departures from the patented device do not avoid infringement, see McCormick v. Talcott, 20 How. 402, 405, 15 L.Ed. 930. A close copy which seeks to use the substance of the invention, and,

although showing some change in form and position, uses substantially the same devices, performing precisely the same offices with no change in principle, constitutes an infringement. Ives v. Hamilton, 92 U.S. 426, 430, 23 L.Ed. 494."

 In Claude Neon Lights, Inc., v. E. Machlett & Son et al., 2 Cir., 36 F.2d 574, 576, Judge Learned Hand pointed out that the doctrine of equivalents means more than that the language of claims shall be generously construed, being based upon the theory that the claim is not intended to be verbally definitive, but to cover the invention, which should to some extent be gathered from the disclosure at large. Summarizing his conclusion, with respect to the apparent conflict between the doctrine of equivalents and the doctrine that the patent is limited by the claims, he says:

"On the one hand, therefore, the claim is not to be taken at its face—however freely construed—but its elements may be treated as examples of a class which may be extended more or less broadly as the disclosure warrants, the prior art permits, and the originality of the discovery makes desirable. On the other, it is not to be ignored as a guide in ascertaining those elements of the disclosure which constitute the 'invention,' and without which there could be no patent at all."

See also Smith v. Snow, 294 U.S. 1, 55 S.Ct. 279, 79 L.Ed. 721; Waxham v. Smith, 294 U.S. 20, 55 S.Ct. 277, 79 L.Ed. 733; Morley Sewing Machine Co. v. Lancaster, 129 U.S. 263, 9 S.Ct. 299, 32 L.Ed. 715; Imhaeuser v. Buerk, 101 U.S. 647, 656, 25 L.Ed. 945; Oates v. Camp, 4 Cir., 83 F.2d 111; Hoeltke v. C. M. Kemp Mfg. Co., 4 Cir., 80 F.2d 912; Wine Ry. Appliance Co. v. Baltimore & O. R. Co., 4 Cir., 78 F.2d 312; Black & Decker Mfg. Co. v. Baltimore Truck Tire Service Corp., 4 Cir., 40 F.2d 910; Gulf Smokeless Coal Co. v. Sutton, Steele & Steele, 4 Cir., 35 F.2d 433; Frick Co. v. Lindsay, 4 Cir., 27 F.2d 59; 20 R.C.L. 1155, 1156.

 It must be borne in mind, however, that the second Reynolds patent was not confined to the machine with the tongued and grooved rolls. It was a process as well as a machine patent and four of its claims, 25, 26, 27 and 28, were added after defendant had brought out its J frames and were purposely made broad enough to cover them. And it is not material that the specification does not show all of the processes or mechanical devices covered by the claims, since the claims, not the specification, measure the invention. Smith v. Snow, supra, 294 U.S. 1, 11, 55 S.Ct. 279, 79 L.Ed. 721. The court below has found, and we agree with the finding, that the J frames, either in themselves or in the process which they use, are covered by the following six claims of the patent, viz.:

"15. The process of drawing fibrous material arranged in strand form which includes giving the strand a substantially uniform thickness throughout its width before drawing, then drawing the strand, and thereafter restoring the strand to uniform thickness throughout its width, and holding the strand from vertical and transverse expansion throughout substantially the entire portion of its length following the said drawing and preceding the said restoration of uniform thickness."

"22. The method of cotton spinning consisting in the successive steps of drawing a strand of fibrous material, relieving it from all appreciable draft throughout a substantial length, holding it from transverse and vertical expansion throughout this length, condensing and folding it at the end of this length, and thereafter subjecting it to a further draft, in one continuous process."

"25. Mechanism for drafting fibrous material in strand form having in combination means for drawing the strand, pairs of driven opposed rolls propelling the strand, means acting on the strand intermediate its extent from the nip of one of such pairs to the nip of the next succeeding pair thereof to fold the strand longitudinally inward upon itself so that the fibers which lie at the lateral margins of the strand as the latter passes the first of such pairs of rolls are continuously shifted to occupy a position intermediate the width of the strand as the latter passes the succeeding pair of rolls, the latter pair of rolls propelling the strand at a faster rate than the first of such pairs to take up the slack in certain portions of the cross-section of the strand incident to folding but without effecting any material draft of the entire width of the strand.

"26. Mechanism for drafting fibrous material in strand form having in combination pairs of opposed rolls propelling the strand, stationary grooved means engaging the strand, and means engaging the

strand at points within the groove to cause the sides of the groove to shift the lateral margins of the strand into positions within the width of the strand.

"27. Mechanism for drafting fibrous material in strand form including pairs of opposed rolls propelling and elongating the strand, stationary means located between pairs of such rolls engaging the lateral sides of the strand and diverting them inward toward the median line of the strand, and means pressing the strand in a vertical direction cooperating with the stationary means to cause the fibers comprising such lateral sides to be shifted inwardly past the fibers forming intermediate portions of the strand and to assume a position nearer the median line than such latter fibers and to maintain such position as they pass between a following pair of propelling rolls.

"28. Mechanism for drafting fibrous material in strand form including pairs of opposed rolls propelling and elongating the strand, stationary means engaging the lateral sides of the strand and diverting them inward toward the median line of the strand, and roll means propelling the strand and pressing the strand in a vertical direction cooperating with the stationary means to cause the fibers comprising such lateral sides to be shifted inwardly past the fibers forming intermediate portions of the strand and to assume and maintain after such pressing a position nearer the median line than such latter fibers."

There can be no question, we think, but that these claims cover the mechanism and the process of the J frames when given the liberal interpretation to which the character of the invention entitles them. It is conceded that ordinarily the validity of claims of a patent under which a license has been granted may not be attacked by the licensee. See Lawes v. Purser, 6 El. & Bl. 930, 88 E.C.L. 930, 38 Eng.L. & Equity 48; United States v. Harvey Steel Co., 196 U.S. 310, 25 S.Ct. 240, 49 L.Ed. 492; Kinsman v. Parkhurst, 18 How. 289, 15 L.Ed. 385; Strong v. Carver Cotton Gin Co., 197 Mass. 53, 83 N.E. 328, 14 L.R.A.,N.S., 274, 14 Ann.Cas. 1182 and note. Defendant contends, however, that it is permitted to attack the validity of claims 25, 26, 27 and 28 of the Reynolds patent, because they were applied for and allowed after it had obtained the Jones patent and entered upon the manufacture of the J frames. It contends, also, that all the claims, even if valid, must be limited to exclude the prior art and, when so limited, do not cover the J frames. We do not think that there is anything in either contention.

In support of the contention that claims 25–28 were filed too late, defendant relies upon the decision in Webster Electric Co. v. Splitdorf Electrical Co., 264 U.S. 463, 44 S.Ct. 342, 68 L.Ed. 792, which holds, in general application of equitable principles, that where the filing of divisional claims has been unreasonably delayed they should not be allowed to the prejudice of intervening rights. The general rule, of course, is that the right to amend and continue an original application is not lost except by failure to respond to action of the Patent Office within the time required by law. Overland Motor Co. v. Packard Motor Car Co., 274 U.S. 417, 47 S.Ct. 672, 71 L.Ed. 1131. And in recent decisions it has been held that the rule of Webster Co. v. Splitdorf, supra, has application only where there are intervening rights which will be adversely affected. Crown Cork & Seal Co., Inc., v. Ferdinand Gutmann Co., 304 U.S. 159, 58 S.Ct. 842, 82 L.Ed. 1265; General Talking Pictures Corp. v. Western Electric Co., 304 U.S. 175, 546, 58 S.Ct. 849, 82 L.Ed. 1273. Here there were no intervening rights, but merely an attempt on the part of defendant to perpetrate a wrong by the appropriation of what in equity, good conscience and common honesty belongs to plaintiffs. Instead of aiding defendant in the perpetration of such a wrong, the powers of equity should be used to prevent it; and claims allowed by the Patent Office to cover the invention which defendant was bound to respect should be upheld and enforced notwithstanding the delay in asking them. In the ordinary case, the rights of innocent third parties are prejudiced by the delayed broadening of claims, and the patentee gets something which because of his lack of diligence he ought not be allowed to their prejudice. Here the patentee gets only that to which he is justly entitled, and the only thing lost by any one is the unconscionable advantage which defendant seeks to take of plaintiffs' confidential disclosure.

But even if claims 25 to 28 are disregarded, defendant's position is not helped. The process of the J frames is still covered by claims 15 and 22; and, as pointed out above, the machines themselves

are covered by other claims under a proper application of the doctrine of equivalents, even though the patent had merely claimed the machine described in the specification and drawings.

And we are not impressed with the contention that the claims of the patent must be so limited by the prior art that they do not cover the J frames. We have examined the prior art with care and nowhere do we find any of the elements of the Reynolds invention which the J frames have embodied. Jones, who claims to have invented the J frames, does not claim to have had any knowledge of the prior art patents upon which defendant relies or to have utilized them in any way; and it is little short of absurd that defendant, after hailing Reynolds' invention as a revolutionary improvement in the art, should now take the position that all that was valuable in it had been old for half a century. The prior art particularly relied on consists of mere paper patents which never went into use and which embody none of the features which have made the Reynolds and J frames successful. These are the DeHemptinne patent of 1865 and the Abbott and Russell patents of 1885. None of these employs folding in the presence of take up as a means of reforming the sliver and none causes the sliver to travel under tension against surfaces as a means of preventing vertical and transverse expansion. The same is true of the Casablancas patents to which defendant refers. Defendant relies particularly upon the Abbott and Russell patents of 1885 because they show the use of condensing trumpets between drafts of the sliver; and defendant calls its folding block a trumpet. The name, of course, is not important, and we are satisfied that the function of the folding block is very different from that of the Abbott and Russell trumpets. The latter were not designed to cause a folding of the sliver and they were not placed in such way as to cause the sliver to travel under tension against the inside surface of the trumpet, as is the case in the so-called trumpets of the J frames. If the J model had been designed to embody the principles of Abbott and Russell instead of the Reynolds machine, it would doubtless have failed just as they did.

To conclude on this branch of the case, it is clear that the J frames are covered by the claims of the second Reynolds patent; that none of the claims should be disregarded because of late filing; that, even if the last four claims are disregarded, the J frames employ the process covered by claims 15 and 22, the machines themselves being covered by the patent under a proper application of the doctrine of equivalents; and that there is nothing in the prior art which so limits the claims that they do not cover the J frames. These frames were properly held to be covered by the patent and hence subject to the payment of royalties under the contract.

2. The Obligation of the Contract.

The liability of the defendant for royalties, however, is to be determined by the terms of the contract, not by technical considerations of patent law. If the J frames which defendant is manufacturing substantially embody the Reynolds invention, defendant is liable for royalties irrespective of the validity of the claims, so long as they have not been held to be invalid, and irrespective of whether or not certain features of the invention may be found in the prior art. Controlling in this aspect of the case is the decision in Eclipse Bicycle Co. v. Farrow, 199 U.S. 581, 586–588, 26 S.Ct. 150, 152, 50 L.Ed. 317, where the Supreme Court, speaking through Mr. Justice Holmes, laid down the applicable rule in the following language:

"The real questions in the case are whether the first-mentioned Morrow device and the subsequent E 10 fall within the scope of the contract, and these questions depend more upon a careful construction of that instrument than upon nice discriminations between the patents that were or might have been issued. If either of the contrivances used embodies the invention described in Farrow's applications, then the defendant is bound to account for it by the express terms of its covenant, unless the contract is at an end. * * * We come back to the construction of the contract. The royalty is to be paid on the 'invention above referred to.' The use of the word 'invention' does not open the state of the art and allow the defendant to meet the plaintiff's claim by proving that he had invented nothing new. The royalty is to be paid on the invention described in the specified applications—that is to say, on the contrivances there described—unless and until there is final adverse action by the Patent Office."

In point also is the decision in Carbo-Frost, Inc., v. Pure Carbonic, Inc., 8 Cir.,

103 F.2d 210, 223, where Judge Stone, speaking for the Circuit Court of Appeals of the 8th Circuit, thus interprets the rule of the Farrow case:

"The language in and requirements under the contract in the Farrow case is substantially the same as in and under the contract before us. The rule stated in that case is the rule to be followed by us. That rule is that there is liability for royalties here if, and only if, the Harrisburgs substantially embody the device here licensed —such similarity to be determined by a 'broad comparison and contrast' of the two devices—and are no better. The issue is not at all one of infringement. It is whether, broadly and generally considered, the Harrisburgs are equivalent to the licensed device. One difference from an infringement issue is that we are not here concerned with the prior art as limiting the licensed device—the licensed device must be taken as it is stated in the patent."

■ One of the arguments advanced by defendant is that folding of the sliver was disclosed but not claimed by the first Reynolds patent and that it consequently became a part of the prior art open to defendant as well as to others. The answer is that under the contract between the parties this disclosure was a part of the invention of Reynolds which defendant was to embody in the machines it was to manufacture and upon which it contracted to pay royalties.

### 3. The Confidential Relationship.

■ The liability of defendant here is not to be determined as upon a charge of patent infringement nor even as in the case of an ordinary licensee under contract for the payment of royalties, for the reason that the J frames upon which royalties are claimed embody not only the fundamental ideas embodied in the Reynolds invention but also a specific application of those ideas evolved by Reynolds himself and communicated to defendant because of the confidential relationship into which the parties had entered for the development of the invention. In other words, defendant is not an independent manufacturer, nor is it a mere licensee manufacturing a machine obtained from an independent source. It is a licensee who was working with Reynolds in the joint enterprise of developing his machine for the market, and who brought out a machine based upon ideas which he conceived and which he communicated in aid of the joint enterprise. There can be no question but that defendant is liable for royalties on the machines embodying Reynolds' idea so communicated, quite irrespective of patent coverage or the terms of the license contract.

■ That there was a confidential relationship existing between defendant and Reynolds when they agreed to work together for the development and marketing of his invention is so clear as not to admit of argument. Cf. Baker Oil Tools v. Burch, 10 Cir., 71 F.2d 31, 37. As said in the case cited, quoting from the note of Judge Hare in 1 Leading Cases in Equity 62: "Wherever one person is placed in such relation to another, by the act or consent of that other, or the act of a third person, or the law, that he becomes interested for him, or interested with him in any subject of property or business, he is prohibited from acquiring rights in that subject antagonistic to the person with whose interests he has become associated."

■ And we think that it is equally clear that the development of the J frames was the result of Reynolds' ideas communicated to the engineers and draftsmen of defendant with whom he was working. The evidence shows beyond peradventure that it was he who conceived the stationary folding block, that he had drawings of it made by defendant's draftsmen and that he had it tested in defendant's experimental department. His testimony that he discussed the use of this folding block in connection with the use of ordinary rolls as in the J frames seems much more credible than defendant's version that they were developed by an engineer who had had no prior experience with machinery of that character upon a suggestion made by an executive whose only professional experience was that of an accountant. At all events, the trial judge, who saw and heard the witnesses and who was in much better position than we are to judge of their credibility, accepted Reynolds' version of the matter; and there is no basis in the record for disturbing his finding with regard thereto.

■ Under the facts as found, therefore, we think there can be no question as to defendant's liability for royalties on the theory that the J frames embody ideas obtained from plaintiffs by virtue of

a confidential relationship. Reynolds was the owner of the intangible property represented by the ideas embodied in the J frames; and, whether they were covered by patent or not, he was entitled to protection against their use by one to whom he had disclosed them in the course of a confidential relationship. Becher v. Contoure Laboratories, Inc., 279 U.S. 388, 49 S.Ct. 356, 73 L.Ed. 752. But for the royalty provisions of the licensing contract, the plaintiffs would have been entitled to profits and damages arising from the manufacture by defendant of the J frames. Chesapeake & O. R. Co. v. Kaltenbach, 4 Cir., 95 F.2d 801; Hoeltke v. C. M. Kemp Mfg. Co., 4 Cir., 80 F.2d 912, 923; Booth v. Stutz Motor Company of America, 7 Cir., 56 F.2d 962. In view of the provisions of the licensing agreement, however, the measure of the recovery is the royalties therein provided; for plaintiffs are entitled to recover merely what would have been theirs if defendant had done what it should have done, i. e. treated the ideas embodied in the J frames as belonging to the Reynolds invention and paid royalties on that basis.

We gave careful consideration to the basic question of liability here involved in the Hoeltke and Kaltenbach cases, supra; and our statement in the Hoeltke case, quoted with approval in the Kaltenbach case [95 F.2d 806], we regard as controlling here, viz.:

"Where, in advance of the granting of a patent, an invention is disclosed to one who, in breach of the confidence thus reposed, manufactures and sells articles embodying the invention, such person should be held liable for the profits and damages resulting therefrom, not under the patent statutes, but upon the principle that equity will not permit one to unjustly enrich himself at the expense of another. The question was before the Circuit Court of Appeals of the Seventh Circuit in the recent case of Booth v. Stutz Motor Car Company of America [7 Cir.] 56 F.2d 962, and we think that the decision there rendered is eminently sound and just. It would be a reproach to any system of jurisprudence to permit one who has received a disclosure in confidence to thus appropriate the ideas of another without liability for the wrong."

■ Because the Jones patent embodied ideas disclosed by Reynolds and appropriated by defendant in breach of the confidential relationship existing between the parties, we think the court below was correct in holding that plaintiffs were entitled to the patent and in directing that defendant assign it to them. Becher v. Contoure Laboratories, supra, 279 U.S. 388, 49 S.Ct. 356, 73 L.Ed. 752; Allen-Qualley Co. v. Shellmar Products Co., D. C., 31 F.2d 293, affirmed 7 Cir., 36 F.2d 623, dismissal of bill of review affirmed 7 Cir., 87 F.2d 104; Liquid Carbonic Corp. v. Goodyear Tire & Rubber Co., D.C., 38 F.Supp. 520.

■ Defendant objects to the declaratory feature of the judgment holding that the J frames are within the terms of the license agreement and that plaintiffs will be entitled to royalties thereunder upon all machines of this type or like machines manufactured and sold by defendant. The declaratory feature adds nothing to the effect that the decree would otherwise have in proper application of the elementary principles of res adjudicata. See Tait v. Western Maryland Ry. Co., 4 Cir., 62 F.2d 933, affirmed 289 U.S. 620, 53 S.Ct. 706, 77 L.Ed. 1405. In as much as it merely makes explicit what would otherwise be implicit, however, there can be no objection to it; and the fact that defendant has raised objection indicates that it may have served a useful purpose in making clear the extent and effect of the adjudication.

There was no error and the decree appealed from will be affirmed.

Affirmed.