261 F.2d 197
 AMERICAN CASUALTY COMPANY OF READING, PENNSYLVANIA, and Bay
Construction Company, Incorporated, Appellants,
v.
SOUTHERN MATERIALS COMPANY, Incorporated, use-plaintiff, Appellee.
 No. 7727.
 United States Court of Appeals Fourth Circuit.
 Argued Oct. 23, 1958.
Decided Nov. 13, 1958.
 
 1
 Norris E. Halpern and Spencer Gill, Jr., Norfolk, Va. (Rixey & Rixey, Norfolk, Va., on brief), for appellants.
 
 
 2
 Charles L. Kaufman, Norfolk, Va., for appellee.
 
 
 3
 Before HAYNSWORTH, Circuit Judge, and BARKSDALE and BRYAN, District judges.
 
 
 4
 BARKSDALE, District Judge.
 
 
 5
 This is an appeal by American Casualty Company of Reading, Pa. (hereinafter referred to as 'American'), and Bay Construction Company, Inc. (hereinafter referred to as 'Bay'), from a judgment in the sum of $10,649.06 rendered against them in favor of Southern Materials Company, Inc. (hereinafter referred to as 'Southern'), for ready-mixed concrete delivered by Southern to Seaboard Construction Company, Inc. (hereinafter referred to as 'Seaboard'), a sub-contractor of Bay, in an action instituted under the provisions of the Miller Act, 40 U.S.C.A. 270b. There was no controversy about the amount. The case was tried by the court without a jury, and the facts, as found by the court, are substantially as follows:
 
 
 6
 On November 26, 1954, Bay entered into a contract with the United States to construct a towing tank for the highspeed hydro-dynamic facility of the National Advisory Committee for Aeronautics (hereinafter referred to as 'NACA'), located at Langley Field, Virginia. As required by the Miller Act (40 U.S.C.A. 270a), Bay gave its payment bond with American as surety. Before entering into the contract, Bay obtained from Southern a statement showing the prices at which Southern would furnish readymixed concrete for the project, and Southern assisted Bay in obtaining permission from NACA to use ready-mixed concrete on the project. Thereupon, Southern agreed to furnish, and Bay agreed to purchase, at the quoted prices, all the ready-mixed concrete needed for the project. At the request of Bay's supervisor, Christiansen, Southern began the delivery of ready-mixed concrete on or about March 24, 1955, billing the concrete furnished on the first three days directly to Bay. At the time, Southern had no knowledge of the existence of any subcontractor for the concrete work. After the first three days, Christiansen informed Southern that Bay had subcontracted the concrete work to Seaboard and requested that all bills for concrete be directed to Seaboard. Southern continued to deliver concrete for the project until June 3, 1955, and pursuant to Bay's request rendered all bills, including the concrete furnished during the first three days, to Seaboard. No part of these bills was ever paid by Seaboard. All the concrete delivered for the project prior to June 3, 1955, was on the oral order of Bay's superintendent, Christiansen, there being no contact between Southern and Seaboard aside from the billings. Christiansen was regularly employed by Bay, but as he was supposed to look after the joint interests of Bay and Seaboard, one-half of his salary was paid by Seaboard. This fact was not known by Southern. On June 3, 1955, Bay's president advised Southern that Seaboard had abandoned the job. Southern thereupon advised Bay that no part of its bill for the concrete delivered on the job had been paid by Seaboard, and that it would have to notify the bonding company and the Public Works Officer at Langley Field. Bay urgently requested Southern not to give such notice, informed Southern that it would complete the contract work, and requested that Southern continue to deliver concrete to Bay on the job. Bay, through its president, verbally agreed to pay Southern for the concrete previously delivered to the job site and billed to Seaboard. The district court found that this agreement was supported by a valid consideration in that (1) Southern relinquished its right to give written notice to the parties under the Miller Act and (2) it continued to deliver concrete to the job site at the same prices which prevailed when the billings were directed to Seaboard, all of which was at the request of Bay.
 
 
 7
 Thereafter, Southern continued to deliver concrete for the project until it had been completed, which was promptly paid for by Bay. After it had quit the job, Seaboard went into bankruptcy. Southern filed no claim against Seaboard in the bankruptcy proceeding; Bay did file its claim for money owing to it by Seaboard, but received nothing on its claim. Neither did Bay receive anything from the proceeds of the equipment which Seaboard left on the job when it quit. After completing its contract and obtaining final settlement with the United States, Bay refused to pay for the concrete delivered by Southern to Seaboard prior to June 3, 1955, and this suit followed.
 
 
 8
 So far as pertinent, the Miller Act (40 U.S.C.A. 270b) is as follows:
 
 
 9
 '(a) Every person who has furnished labor or material in the prosecution of the work provided for in such contract, in respect of which a payment bond is furnished under section 270a of this title and who has not been paid in full therefor before the expiration of a period of ninety days after the day on which the last of the labor was done or performed by him or material was furnished or supplied by him for which such claim is made, shall have the right to sue on such payment bond for the amount or the balance thereof, unpaid at the time of institution of such suit and to prosecute said action to final execution and judgment for the sum or sums justly due him: Provided, however, That any person having direct contractual relationship with a subcontractor but no contractual relationship express or implied with the contractor furnishing said payment bond shall have a right of action upon the said payment bond upon giving written notice to said contractor within ninety days from the date on which such person did or performed the last of the labor or furnished or supplied the last of the material for which such claim is made, stating with substantial accuracy the amount claimed and the name of the party to whom the material was furnished or supplied or for whom the labor was done or performed. * * *'
 
 
 10
 Since the proviso in the above quoted statute recites:
 
 
 11
 'That any person having direct contractual relationship with a subcontractor but no contractual relationship express or implied with the contractor furnishing said payment bond shall have a right of action upon the said payment bond upon giving written notice to said contractor within ninety days from the date on which such person did or performed the last of the labor or furnished or supplied the last of the material for which such claim is made, * * *'.
 
 
 12
 it would seem to follow that any person, such as a materialman, having direct contractual relationship with a subcontractor and also contractual relationship express or implied with the contractor furnishing said payment bond (prime contractor), has the right to sue upon the payment bond without being required to give written notice to the prime contractor within the ninety-day period mentioned in the statute. The district court so concluded, and its conclusion is amply supported by the authorities. United States for Use of W. E. Foley & Bro. Inc., v. United States Fidelity & Guaranty Co., 2 Cir., 113 F.2d 888, United States for Use of Strona v. Bussey, D.C., 51 F.Supp. 996, United States ex rel. Hirgis v. Maryland Casualty Co., D.C., 64 F.Supp. 522, United States for Use of Bruce Co. v. Fraser Construction Co., D.C., 87 F.Supp. 1.
 
 
 13
 As was said in the Foley case, supra (113 F.2d at page 890):
 
 
 14
 'It will be observed that the proviso refers to 'any person having direct contractual relationship with a subcontractor but no contractual relationship express or implied with the contractor.' Warren Corporation is not within that definition. It had direct contractual relationship with the subcontractor and it also had express contractual relationship with the contractor by reason of Fiumara's guarantee of Foley's account. Not falling within the class defined by the proviso, we think the Warren Corporation is covered by the first sentence of section 270b and had the right to sue upon the Miller Act bond without giving the notice required of materialmen who have no contractual relationship with the general contractor. Such notice is evidently for the protection of the contractor. See United States for Use and Benefit of Hallenbeck v. Fleishman Engineering & Const. Co., 2 Cir., 107 F.id 925, 928. It is not needed when the contractor has himself entered into an agreement with the materialman of a subcontractor. United States ex rel. and for Use and Benefit of Korosh v. Otis Williams & Co., D.C.Idaho, 30 F.Supp. 590. In ruling that notice was required to fix the rights of Warren Corporation under the Miller Act bond we think the district judge was in error.'
 
 
 15
 Appellants contend that on the facts of this case Southern could not maintain this suit, since it had not given the statutory written notice, and rely heavily on the case of Bowden v. United States for the Use of Malloy, 239 F.2d 572. However, this case does not support appellant's contention. There, within the statutory ninety-day period, the subcontractor wrote a letter to the prime contractor, listing its unpaid materialmen, including Malloy. Malloy himself gave no notice to the prime contractor of the subcontractor's indebtedness to him, but contended that the subcontractor's letter to the prime contractor listing the indebtedness to him was sufficient compliance with the Miller Act. The district court agreed with this contention, and rendered judgment in favor of Malloy. However, the court of appeals reversed for the reason that in its opinion the subcontractor's letter did not constitute compliance with the Act, which requires written notice from the supplier or materialman as a condition precedent to a right of action on the bond. As to the question of whether or not Malloy had a contractual relationship with the prime contractor, the court said (at page 576):
 
 
 16
 'As pointed out above, the district judge concluded that Malloy had a direct contractual relationship with Hickey but no contractual relationship, express or implied, with the prime contractor. In view of this conclusion, it followed that Malloy could have a right of action upon the payment bond only if he had given written notice to the prime contractor as provided in the statute. Thus, the large question presented by the appeal in the case is: Was the letter of December 12, 1952, from Hickey to the prime contractor 'notice' under the provisions of 40 U.S.C.A. 270b (a)? We hold that it was not.',
 
 
 17
 and further the court said (at page 578):
 
 
 18
 'Appellee says in his brief that even though it be found that no sufficient notice under the statute was given, the judgment below must be upheld because there was a direct contractual relationship between Malloy and the prime contractor, which the district court should have found and which rendered notice unnecessary. However, no effort is made by the appellee in his brief to point out the evidence in the record which required the district court to find such contractual relationship. We have ourselves examined the entire record and find no error in the district court's conclusion that Malloy had no contractual relationship, express or implied, with the prime contractor.'
 
 
 19
 It being conceded that no written notice of its claim against Seaboard was given to Bay by Southern, appellants contend that, in order to maintain this Miller Act suit, it was incumbent upon Southern to prove that an enforceable promise was made by Bay to pay Southern the debt in question.
 
 
 20
 On the other hand, appellee contends that even though the verbal agreement entered into by Bay and Southern on June 3, 1955, was no more than a promise to pay the debt of another and unenforceable by reason of the Statute of Frauds, it could still maintain this suit, because the requirement of the statute that there exist between them some 'contractual relationship, express or implied', had been complied with. It is unnecessary, however, for us to consider these conflicting contentions. The district court found that the agreement entered into between Bay and Southern on June 3, 1955, was a new agreement supported by a valid consideration and not within the Statute of Frauds.
 
 
 21
 Therefore, it seems obvious that the only real question before us is whether or not the findings of the district court were supported by the evidence. On this question, this court, through Judge Parker, said in Saco-Lowell Shops v. Reynolds, 4 Cir., 141 F.2d 587, 589:
 
 
 22
 'The question involved in the appeal are very largely questions of fact and the learned trial judge has given them thorough consideration, * * * These findings are binding upon us except to the extent that we are prepared to hold that they are clearly wrong, * * *.'
 
 
 23
 As to appellate review of findings of fact, Rule 52(a), F.R.Civ.P., 28 U.S.C.A., provides:
 
 
 24
 'Findings of fact shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge of the credibility of the witnesses.'
 
 
 25
 As to what took place on June 3, 1955, undoubtedly there is conflict in the evidence. While admitting that he entered into some sort of an agreement, Bay's president testified that he went no farther than to promise to pay Southern on its account against Seaboard any money which might come into Bay's hands for the benefit of Seaboard and any money which Bay might realize from Seaboard's equipment life on the job, and that even this conditional promise was without consideration. On the contrary, the testimony of Southern's representative was amply sufficient to support the finding of the district court that a valid agreement was entered into to pay for the concrete theretofore delivered by Southern which was supported by a valid consideration. In this situation, there is certainly no basis for us to reach the conclusion that the findings of the district court were clearly erroneous. On the contrary, a consideration of all the evidence leads us to the conclusion that the findings of the district court were plainly right.
 
 
 26
 It follows that the judgment of the district court is
 
 
 27
 Affirmed.