**SLOAN et al. v. MUD PRODUCTS, Inc.**

Civ. No. 3026.

United States District Court
N. D. Oklahoma.
Aug. 11, 1953.

Poe, Murdock & Langford, Tulsa, Okl., for plaintiff.

Conner, Winters, Randolph & Ballaine, Tulsa, Okl., and John S. Athens, Tulsa, Okl., for defendant.

WALLACE, District Judge.

The plaintiffs, Mrs. John I. Sloan and John H. Poe, bring this action against the defendant, Mud Products, Inc.,[1] a corporation, to gain an accounting for past sales and an injunction against future sales in regard to an alleged novel disclosure made by John I. Sloan,[2] now deceased, to whose rights the plaintiffs have succeeded, to officers of the defendant company at a time

1. Herein referred to as Mudco.

2. Herein referred to as Sloan.

when Sloan and the said officials enjoyed a confidential business relationship.

The contested property right involves the adaptation of the butterfly valve principle to the control of the flow of drilling mud through the lines and equipment of rotary drilling rigs used in drilling for oil and gas.

The plaintiffs urge that Sloan originated and developed the valve in question for the previously mentioned use and disclosed such discovery to the defendant company with the mutual understanding that the valve would be exploited to the monetary benefit of both the defendant company and the discoverer, Sloan.

Although Mudco acknowledges that Sloan had a part in the early development and manufacture of said valve, defendant denies that Sloan authored the original idea. Defendant insists that the only legal right Sloan possessed was a right founded upon express contract and that all contracts between the parties have now been fully executed.

### I
### The Origin of the Mudco Butterfly Valve

■ The first issue is whether Sloan occupied the position of a discoverer or merely an artisan called in for practical aid in the development and manufacture of an idea originating in one other than Sloan. On this point the evidence is in irreconcilable conflict. However, from the adduced evidence the Court is of the opinion that Sloan originated and developed the Mudco Butterfly Valve as applied to mud control.

On August 24, 1948, Sloan and Mudco entered into a letter agreement whereby the parties contracted for the manufacture, marketing and further development of this valve.[3] The agreement not only bound Mudco, a sales organization,[4] to diligently market all valves manufactured under Sloan's supervision, allowing him a reasonable profit over the cost of manufacture, but impliedly recognized a proprietary interest in this valve in Sloan. This first letter agreement, written by Sloan and accepted by Mudco, among other things, stated:

"This is to confirm our verbal conversations and negotiations relative to your marketing *valves which I have developed* and which *we have referred to as the Sloan Butterfly Valve.*

"It is understood that you will market these valves and sell them yourself and through any and all responsible outlets desiring them for sale. *In consideration of the fact that I first presented the principle of these valves to you and of my services in constructing the first units which enabled you to make your original sales and present the same for sale,* you have agreed to purchase all such valves which you sell from me, at the cost of manufacturing to me, plus a reasonable markup to insure a reasonable profit to me." (Emphases supplied.)

It is most difficult to harmonize the above wording with Mudco's argument that the idea in question had its origin apart from Sloan, and that Sloan was merely called in as an experienced welder to lend his practical aid to develop and manufacture the valve.[5] In addition, the fact that Mudco recognized a proprietary interest in Sloan, as distinguished from a straight manufac-

---

3. See (PX-4).

4. As mentioned by Mr. Albert, Mudco's president: "He [Sloan] was to make them and we were to buy them, because we sought to stay out of the manufacturing business, and as you well know we didn't manufacture and never have manufactured any of the products, don't do it today because we are a sales company and not a manufacturing company." (R. 230.)

5. Albert testified further: "I returned it to Tulsa and due to our close association with Shorty Sloan, I gave him the instructions of the order, which was quite normal at the time, to build those; that was his job. He was a contract welder, which we had done a heck of, a considerable amount of business with, and actually commissioned him to build the 16 inch valve. * * * It was just like hiring a piece of welding work done at that moment. You see, he had done other work for us." (R. 226, 229.)

turing contractual right, is clearly established by the letter agreement of October 5, 1948, which was entered into after Sloan became ill and was unable to supervise the manufacture of the valves. This subsequent agreement, which modified the original letter agreement, gave Mudco the authority to have some reputable manufacturer construct these valves. Obviously, such authority would not have been needed if the defendant had recognized no proprietary right in Sloan. In addition, the modifying agreement provided:

"* * * that no major changes will be made in the design or construction of the valve unless I have been notified thereof and agreed thereto.

"It is my understanding that the royalty to be paid me in connection with the manufacture and sale of these valves shall be $1.25 per diameter inch for each valve manufactured."

If such does not acknowledge that Sloan had a proprietary interest as originator of the valve in question it is difficult for the Court to visualize just what wording could indicate such an interest.

The explanation by the president of Mudco that the contracts were signed by him in ignorance, without the benefit of legal counsel, is difficult for the Court to accept.[6]

In the first letter agreement there is an express recitation that Sloan "presented the principles of these valves" and "developed" them. Then, subsequently, when Sloan was unable physically to lend any further practical assistance in the manufacture of the valves, he was given a royalty right coupled with the promise "that no major changes will be made in the design or construction of the valve" without Sloan's consent.

Mudco's assertion that Sloan was a mere artisan employed for practical aid to develop and to manufacture the valve is too inconsistent with these prior admissions to be worthy of credence.[7]

On February 28, 1950, a new, the final contract was entered into between the parties;[8] this agreement cancelled all prior contracts. Once again Mudco agreed to pay Sloan, and John H. Poe, partial assignee of Sloan, royalties on these valves. Such can only be construed to mean that

6. Mr. John Winters, the attorney who incorporated Mudco, testified that he represented the Flint interests in the summer of 1948 including the Flint Steel Company, The Tulsa Rig and Reel Company, and Mudco, in which Flint had a substantial interest. Doubtless, Albert had capable legal advice available.

7. The evidence indicates that Sloan was much more than a mere welder and was certainly capable of originating ideas of commercial value. Long prior to the first butterfly valve contract of August 24, 1948, there had been a business association between Mr. Albert, president of Mud Products and Sloan relating to mud equipment inventions and devices originated by Sloan. Sloan previously had invented and received patents on the "Muderator", used in mixing drilling mud, and on a "drill pipe mud control" invention. As a direct result of these previous inventions Albert had invited Sloan to submit to Mud Products any newly discovered items or ideas.

Also, sometime before July 26, 1948, Mr. Poe was shown by Sloan a constructed butterfly valve at the Apex Machine

Shop in Tulsa. He fixed this date as prior to the drawing (PX 10) by Mr. Weakley made of the Mud Induction Unit with Degassor; this drawing was dated July 26, 1948, and showed the butterfly valve attached.

Mr. Poe testified that he had various conversations with Albert about Sloan's valve and that as a result of a formal conference on August 23 or 24, 1948, Poe returned to his office and prepared the first letter agreement dated August 24, 1948. In this connection Poe stated: "* * * Well, so the result of that conference was that we agreed as to what our agreement, oral understanding was, and I went back to my office and prepared the letter just like I told him in the conference that it would be prepared, and it recited the things that we felt were the considerations going from one party to the other. There was no thought in anybody's mind that it was anybody's valve but Sloan's butterfly valve. That's all we ever referred to it, at that time, was Sloan's butterfly valve." (R. 62.)

8. See (PX 6).

920

Mudco considered Sloan the originator of the valve in question and believed Sloan to have a property right therein.

The evidence indicates that at the time of the execution of the final agreement, Mudco was seeking a way to avoid further royalty payment to Sloan;[9] however, apparently the defendant company did not wish at that time to force the dispute to the point of judicial determination.[10] Doubtless, there was hope that the differences between the parties could be solved short of outright litigation. Regardless, if Mudco knew as a fact that Sloan had no legitimate part in the origination of the valve, the defendant would have taken an immediate and resolute stand.

The conduct of Mudco surveyed as a whole is the strongest of evidence that Sloan did originate and develop the Mudco Butterfly Valve as used in mud control.[11]

The defendant company insists that inasmuch as Sloan has already been paid almost $19,000, that conceding the idea originated with Sloan, such idea in equity has already been paid much more than it was worth. However, the very fact the defendant company paid almost $19,000 to

Sloan once again implies that Sloan was the true discoverer; it is absurd upon its face to rationalize that any company would pay some $19,000 for the amount of practical information and help given by Sloan in the development of this idea, if the idea originated in another.

## II
## The Significance of the O Ring Development

The defendant company next argues that conceding, without admitting, that Sloan originated the butterfly valve application to mud control that the valve now being manufactured and sold by the defendant company is a new and distinct idea and valve from the original Sloan Butterfly Valve. Defendant urges that the original Sloan Butterfly Valve proved impractical and unworkable inasmuch as the valve was not leak proof; and, that only the O Ring invention and improvement made the valve of commercial value.

The evidence indicates that in the spring of 1949 the defendant company developed the neoprene O Ring valve which was a butterfly valve with qualities enabling the valve to form a perfect seal for all fluids under high pressure.[12]

9. As Albert testified, "Well, we felt like that the valve was so radically different than the original valve, that we had done all the development and at our full expense with our own personnel, and at that time we had our own patent applications in on the principle of the 'O' ring. We felt perfectly within our rights to think that we owed no further royalty." (R. 254.) This testimony once again indicates that no question was ever raised that Sloan fostered the original valve and idea. The complaint here was that the defendant had come up with a new and completely different valve and idea.

10. After many meetings and conversations the final contract of February 28, 1950, was entered into giving Sloan and Poe certain royalty rights for two years. See (PX 6, DX 1).

11. A letter from defendant's Chief Engineer to a manufacturer of the valve referred to the valve in question as "Sloan's Butterfly Valve".

Also, a working agreement contract tendered from the Secretary and Treasurer of Mudco to Hodgson Engineering and Manufacturing Company in regard to the

manufacture of the valve, provided in part: "Mud Products, Inc. has an exclusive license and sales right to manufacture and sell a butterfly valve, invented and with patent application made by Mr. J. I. Sloan, and known at present as the Mudco Butterfly Valve. * * * You are familiar with the present design and specifications of the apparatus as set forth in the J. I. Sloan working drawings accompanying this agreement, and you agree that any change in specifications, design, or materials used, or any replacement parts must be first submitted to Mud Products, Inc. and no changes may be made except through mutual agreement with you and Mr. E. R. Albert, Jr. or Mr. John B. Harlow only. You will further agree that all units manufactured must meet the inspection standard set forth by Mr. J. I. Sloan, the inventor, or a representative of Mud Products, Inc. * * * Patent royalties will be paid by Mud Products, Inc., directly to Mr. J. I. Sloan." See (PX 23).

12. Defendant's witness Walker testified: "* * * there are two purposes of butterfly valves, one is to regulate the

Obviously, the general principle of the butterfly valve had been common knowledge for many many years.[13] The originality of Sloan lay in his application of this valve in a practical way to the control of drilling mud. However, admitting that the engineers of Mudco were primarily responsible for the O Ring development, Sloan's original rights, if any, were not prejudiced.

At the time of the O Ring improvement Mudco was bound by contract "that no major changes will be made in the design or construction of the valve" without Sloan's approval. The evidence shows that Sloan was in and out of defendant's place of business almost every day; and that Sloan not only gave his assent to the development but doubtless took an active part in the improvement.[14]

Unquestionably, the neoprene O Ring constituted a marked improvement. However, it was *only* an improvement upon Sloan's original idea to control drilling mud, even if the sealing effect in and of itself is a patentable idea.[15] In the Oil & Gas Journal of November 11, 1948, long before the O Ring was developed, Mudco advertised :[16]

"The Mudco Butterfly Valve solves the problem of obtaining a low cost adjustable opening, self cleaning, minimum wear valve of high versatility in the drilling, production and refining industries. The Mudco Butterfly Valve is of rugged, all steel construction and is designed and manufactured to the closest tolerance of .0005 inches machine fit. This high quality valve is fluid tight upon closure * * *".

This publication pointedly emphasizes that the basic value in Sloan's original idea, that is, low cost, adjustable opening, self-cleaning, minimum wear, high versatility in drilling, steel construction, and designed and manufactured to the closest tolerance to be fluid tight, is the heart of the present Mudco Butterfly Valve with O Ring improvement used in mud control. The only distinguishing feature is that the O Ring effects a perfect seal for all liquids where the original Sloan Butterfly Valve did not. Significantly, for sales promotional purposes even the original Sloan Butterfly Valve was held out to be "fluid tight."

Doubtless, the Sloan Butterfly Valve was satisfactory for the purpose for which it was originally intended, the control of mud. Although the perfect seal brought on by the O Ring development made the valve even more desirable for mud control, the paramount advantage in the O Ring development lay in its adaptability to the control of all fluids.[17]

---

flow and the other to shut it off, and with only one exception, practically all of the butterfly valves that I have had a chance to look into have been designed primarily for controlling the flow rather than shutting it off, whereas this valve is, with the 'O' ring type of seal, perfectly capable of shutting it off at reasonably high pressures, whereas this valve [Sloan's valve without O Ring] couldn't hold any pressures under any circumstances. That is, it couldn't prevent flow at high pressures. It might be able to operate under high pressures but wouldn't shut it off under high pressures." (R. 350, 351.)

13. See 1929 Edition of the Encyclopedia Britannica (DX 33) and Webster's New International Dictionary, Second Edition, 1934 (DX 35). Also, see (DX 24, 25, 26, 27, 28, 30).

14. Plaintiffs' witness Weakley, a draftsman, testified that at Mr. Sloan's direction he made many O Ring drawings which had been designed by Sloan. These were made a short time after August 19, 1948. (See R. 45-50.)

Hodgson, who manufactured the valves for Mudco from the outset until the latter part of 1949, testified that there was a constant effort by all concerned, Mr. Cronk, Mr. Sloan and Mr. Short, to improve the valve. (R. 135-140.) When defendant's counsel asked Hodgson if Sloan knew enough engineering to have developed the O Ring, Hodgson replied, "Well, that would be an opinion. My opinion was that he was smart enough." (R. 147.)

15. An application by Edward H. Short, Jr., for patent on O Ring is now pending.

16. See (PX 23).

17. Hodgson testified: "Q. You understood that improvements were having to be made in it so that it would be tight so that it would hold water didn't you? A. Well, the improvements, I understood, stemmed from the fact that they wanted to use this valve for another application,

### III
#### The Effect of the Contract of February 28, 1950 in Regard to Defendant's Right to Continue to Manufacture and Sell The Mudco Butterfly Valve for the Control of Drilling Mud.

On August 24, 1948, Sloan and Mudco entered into the first letter agreement. The parties contracted for the manufacture, marketing and further development of the Sloan Butterfly Valve. The agreement assured Sloan of a reasonable profit over and above the actual manufacturing cost and bound the defendant company to diligently market the finished product. On the other hand the defendant company was given the *exclusive* right to market the valve.

On October 5, 1948, Sloan and Mudco by a second letter agreement modified the original letter agreement. The modification gave Mudco the right to have some reputable manufacturer produce the valve in question, with the understanding that Sloan was to receive a set royalty on each valve manufactured.

On February 28, 1950, Sloan and John H. Poe entered into a written contract with Mudco, which agreement by its express terms supplanted the previous letter agreements. This final contract provided for the payment of certain royalties upon the Mudco Butterfly Valve with O Ring development; and, included a provision which gave either party the right to terminate the contract at the end of each two year period by giving at least ninety days' notice.

The evidence indicates that the defendant company gave the required notice and terminated, effective February 28, 1952, this last remaining contract.

Although this last contract is very specific in its terms nothing was mentioned in regard to the defendant's authority or lack of authority to continue to manufacture and sell the said valves to control mud in the event of cancellation.

Plaintiffs vehemently urge that of necessity there is an implied provision that defendant cease from the manufacture and distribution of the valve in question at the time the contract is effectively cancelled. Contrarily, defendant insists that inasmuch as there is no specific contractual prohibition, the defendant is free to continue to manufacture and distribute the valve without payment of royalties to the plaintiffs.

■ Generally, in construing contracts every effort is made to interpret the contract in such a way as to not leave a portion of the writing useless or inexplicable.[18] Consequently, there is considerable force to plaintiff's argument that if the defendant company is not required to cease from the manufacture and distribution of the valve that the portion of the contract giving the plaintiffs the right to cancel is useless, inasmuch as the only effect would be to cut off the plaintiffs' royalty rights; obviously, this right the plaintiffs would never exercise.

■ However, from the submitted evidence regarding the preliminary negotiations the Court is satisfied that the question of whether the defendant could continue to manufacture and sell upon cancellation of the last contract was intentionally omitted from the contract due to the parties' inability to reach an agreement on this precise point.[19] The intention of the parties was to

---

irrigation, which dealt with water. I don't, in the processing of mud process that was not—". (R. 144.)

18. See 12 Am.Jur. 775.

19. Mr. Clarence Smith testified, in reference to the meeting at which the termination clause of the final contract was reduced to writing, as follows:
"Q. * * * what did you say and what did Mr. Flint say about whether you [Mudco] should be allowed to go ahead and manufacture the valves in the event you cancelled the contract? A.

I said I thought we could and he agreed with Mr.
"Q. Mr. Flint? A. Yes, sir.
"Q. All right, now what did Mr. Poe say about whether you should be allowed to in the event he cancelled? A. He said he didn't think we could.
"Q. All right, what then, how did you finally resolve this difficulty? A. By *trying to write a compromise paragraph that would leave it open for decision when and if that time came along; after that we parted our ways*." (Emphasis supplied.) (R. 306–307.)

agree upon a royalty due plaintiffs for a period of two years. Apparently, there was hope that the issue would work itself out and there would be no need for an official adjudication. However, by this intentional omission each party saved without prejudice any legal rights then existing, and this final contract has no bearing on this particular issue.[20]

Defendant's argument on the significance of this intentional "agreement to disagree" is somewhat inconsistent. The defendant came forward with proof that the issue in regard to defendant's right to produce the valve after cancellation was intentionally omitted from the contract. At the same time defendant advances the theory that all of the rights of the plaintiffs are tied up in this last contract and that inasmuch as the final contract has been terminated the plaintiffs have no remaining rights. Although the plaintiffs can advance no claim based upon express contractual rights involved in this now fully executed contract,[21] the cancelled contract can in no way impinge any common law property rights not covered by the terms of the cancelled contract. Thus, the issue which remains is whether as between the parties the plaintiffs are in possession of a common law property right which is being imposed upon by the defendant's continued production and distribution of the said valve without payment to the plaintiffs.

## IV
### Do Plaintiffs Possess a Common Law Property Right in Mudco's Butterfly Valve as Adapted to Drilling Mud Systems?

For the plaintiffs to have a protectable property right, in the absence of an express contract, they must establish that the idea Sloan presented to Mudco was (A) novel, (B) that it was presented in concrete form,[22] and (C) that it was dis-

---

In the negotiations leading up to the final contract, a proposed contract prepared by Poe but which was not approved by the defendant provided that upon cancellation of the contract, Mudco should discontinue "the manufacture and/or sale of said valves or any other valves of similar kind and character (Butterfly Valves), which if sold by Mudco would be competitive to the sale of the type of valve covered by this agreement." The second or "alternate paragraph 4", provided that the contract should be for a term of two years "and as long thereafter as Mudco continues to manufacture and/or sell valves of a similar kind and character (Butterfly Valves), and Mudco agrees to diligently market and sell same during said two year period, * * *". (See DX 6.)

The defendant refused to sign the proposed contract (DX 6) but countered with a substitute proposal (DX 7) which reads in part: "6. This Agreement and all the terms and conditions thereof shall terminate at the close of business on December 21, 1951, unless the parties, by agreement in writing entered into prior to said date, shall agree to extend the term hereof. 7. In the event Mudco fails to diligently manufacture, market and sell Mudco Butterfly Valves during the term of this Agreement, Sloan and Poe, acting jointly, shall have the right to cancel this Agreement upon thirty (30) days written notice to Mudco and there-after have the right to manufacture and sell a butterfly valve in competition to Mudco." Sloan and Poe refused to sign this proposed contract which left the parties in set disagreement. (See R. 111, 112, 113.)

Significantly, when the final contract was approved no reference was made regarding the defendant's right to continue to manufacture and sell the valves upon cancellation of the agreement.

20. As mentioned in Corbin on Contracts, Vol. 3, Sec. 564 at page 175: " * * * a provision should not be found by 'implication' when the testimony convincingly shows that such a provision was intentionally omitted, or that the specific matter involved was intentionally left for further negotiation and agreement." See 17 C.J.S., Contracts, § 328, p. 779 et seq.

21. Ford Motorcar Co. v. Rackley, 1917, 65 Okl. 288, 166 P. 427; Bowling v. Aetna Life Ins. Co., 1936, 176 Okl. 405, 55 P.2d 1023; Ford Motor Co. v. Alexander Motor Co., 1928, 223 Ky. 16, 2 S.W.2d 1031. See 12 Am.Jur. p. 1014; 17 C.J.S., Contracts, § 398, p. 888.

22. As mentioned in Bowen v. Yankee Network, Inc., D.C.Mass.1942, 46 F.Supp. 62, 63: "The plaintiff maintains that he has a common-law property right in the plan and that it cannot be appropriated by the defendants with impunity. There is no property right in mere ideas. Drone on

closed in confidence under circumstances which imply that the defendant is to pay for its use.[23]

**(A) *Sloan's application of the butterfly valve principle was novel.***

Mudco vigorously urges that no novelty in Sloan's idea was present inasmuch as the butterfly valve principle, as such, was known and recognized for many many years prior to the development of the Sloan Butterfly Valve.[24] Unquestionably, Sloan did not discover the butterfly valve principle. However, equally unquestioned is the fact that never before had the principle of the butterfly valve been incorporated into a drilling mud system.[25]

Other facts in evidence which tend to prove the novelty of Sloan's particular adaptation are:

(1) The fact that the officials of Mudco constantly referred to the valve as "Sloan's Butterfly Valve", implies that something unique existed in the valve's use and application.[26]

(2) The fact that Mudco's working agreement with the original manufacturer, Hodgson Engineering and Manufacturing Company, stated that, "Mud Products, Inc., has an exclusive license and sales right to manufacture and sell a butterfly valve, invented and with patent application made by Mr. J. I. Sloan, and known at present as the Mudco Butterfly Valve."[27]

(3) The fact that the officials of Mudco were so very enthusiastic about the profitable prospects held out by the valve.[28]

(4) The fact that from the outset orders for the valve came in large numbers; this

Copyright, pp. 98, 385. Ideas not reduced to concrete form are not protected. [citing cases.]" Cf. Anderson v. Distler, 1940, 173 Misc. 261, 17 N.Y.S.2d 674.

23. Smoley v. New Jersey Zinc Co., D.C. N.J.1938, 24 F.Supp. 294, affirmed 3 Cir., 1939, 106 F.2d 314; De Filippis v. Chrysler Corporation, D.C.N.Y.1943, 53 F. Supp. 977.

The Court in Mitchell Novelty Co. v. United Mfg. Co., 7 Cir., 1952, 199 F.2d 462, 465, said, "The authorities set forth a number of elements which a plaintiff is required to establish as a prerequisite to a right to obtain relief in a case of the instant character. Those elements generally are (1) that the idea disclosed must be novel, (2) that it must be made in confidence and (3) that it must be adopted and made use of by the defendant. [Citing cases.]"

The general principle has been stated in 170 A.L.R. 449, 471, to be that, "Independently of patent laws, an inventor or discoverer, or one standing in his position, will be granted appropriate relief in respect of a use or disclosure by one whose knowledge of the invention, discovery, process, etc., was obtained 'in confidence,' or through a confidential relationship, or in fraud or bad faith."

24. See note 13.

25. Defendant's witness Leroux, who qualified as an expert on mud systems, stated: "Q. Now you didn't, on that Number One, well, you didn't incorporate any butterfly valves in that mud system? A. No, the difficulty in the valve on that

one led to the necessity of a butterfly valve, or improved valve.

"Q. Did I understand you to say now you had never known about the use of butterfly valves in mud systems prior to the time that this thing came up, you had never heard of that? A. No, sir.

"Q. It was a new idea as far as you are concerned to use in mud systems? A. The idea of a flapper valve was not new, but as far as in mud systems, it was new to me." (R. 201.)

Mr. Albert, Mudco's president, who also qualified as an expert on mud systems, testified: "As far as I know, I never had seen butterfly valves used in the mud business till we started employing it in such. (R. 231.)

26. See note 7, paragraph 3, and note 11. Also, see (PX 21) where Sloan gave permission to Mudco to use the name "Mudco" in connection with sales promotion.

27. See (PX 23) and note 11, paragraph 2.

28. Hodgson, the original manufacturer of the valve, testified: "Q. All right, now do you recall any conversations with any of these gentlemen [officers of the defendant] in which they told you what they felt the potentialities of these valves were, and why it had an opportunity of being a profitable item on the market, if you recall? A. I can't remember anything specific. I know that the enthusiasm was rather high on it." (R. 141.) Hodgson went on to say: "Q. Did anyone from Mud Products at any time ever tell you why they thought this valve

indicated the valve filled an existing need.[29]

(B) *Sloan's novel idea was presented to the defendant in concrete form.*

The Court is satisfied that not only did Sloan present to Mudco the original idea but that the presented idea was in a well-defined form.

The definiteness of the submitted idea can be inferred from the wording of the first letter contract which provided, "In consideration of the fact that I [Sloan] first presented the principle of these valves to you and of my services in constructing the first units * * *"[30]. What could be more concrete?

There is testimony that the draftsman who did a considerable amount of work for Sloan saw a Mud Induction Unit with Degassor, and butterfly valve attached, sometime before July 26, 1948, and that this unit had been constructed by Sloan personally.[31]

Also, there is evidence that sometime before July 26, 1948, Sloan showed Mr. Poe a constructed butterfly valve at the Apex Machine Shop in Tulsa, Oklahoma, which had been constructed under Sloan's direct supervision and control.[32]

On October 28, 1948, the defendants tendered to the original manufacturer of the valve a working agreement which in addition to referring to Sloan as the inventor of the Mudco Butterfly Valve, went on to say:[33]

"You are familiar with the present design and specifications of the apparatus as set forth in the J. I. Sloan working drawings accompanying this agreement * * *".

Certainly, such evidences explicitness.

By inference it is obvious that Mudco was the recipient of a concrete idea inasmuch as the second letter agreement of October 5, 1948, provided that, "no major changes will be made in the design or construction of the valve unless I [Sloan] have been notified thereof and agreed [sic] thereto".[34] Of necessity the idea was sufficiently defined to warrant an express contractual provision forbidding a major change in design without the originator's permission.

(C) *The Sloan Butterfly Valve as used to control drilling mud was disclosed to defendant in confidence and under circumstances which implied Mudco would pay for its use.*

The single bit of evidence which most persuasively indicates that Mudco did receive and utilize the discovery of Sloan with an implied understanding to pay for its use is the fact that to date the defendant has paid Sloan almost $19,000.

would be attractive on the market? A. Yes, my understanding was it was cheap and easy to apply and welded in the line and didn't take—could be done in the field; it was rugged and cheap, could be operated under adverse conditions." (R. 163.)

Plaintiff Poe in testifying regarding conversations with Albert, defendant's president, said: "I can't recall any formal discussions or the dates of them or anything like that, but I remember that conference in which we formulated what, how we would reduce to writing the oral understanding that the three of us had had up to that time; and there, again, Dick [Albert] reiterated that he wanted to develope his equipment department, that he had the muderator, had a drill pipe mud control—he thought he could get a shale shaker of some kind from somebody, and this valve would complete the picture, would really make him something to start with, and he was sold that the valve was something that would be a boon to mud systems." (R. 62.)

Albert, after the signing of the second letter agreement on October 5, 1948, giving Sloan a set royalty, thanked Mr. Poe for his "whole-hearted co-operation in working up these arrangements with us". (PX 32).

29. The evidence indicates that during March of 1949 the orders for "Sloan's Butterfly Valve" came in so rapidly that defendant's engineer, who was working on the O Ring development, had the experimental work done in another shop rather than interfere with the manufacturing of the valve without O Ring improvement. (Albert, R. 251.)

30. See (PX 4).

31. See (Weakley, R. 36, 37).

32. See (R. 61, Poe).

33. See (PX 23) and note 9, paragraph 2.

34. See (PX 5).

In the second letter contract of October 5, 1948, at a time when it was obvious Sloan could not render any further service, Mudco agreed to pay Sloan $1.25 per diameter inch royalty for each valve manufactured. At the time of this agreement the only conceivable thing of value to be purchased by Mudco was the exclusive use of Sloan's property right as originator of the Sloan Butterfly Valve. Sloan had been stricken with a heart attack and was unable to even supervise the valves' manufacture. Such conduct by the defendant amounts to an admission which it cannot now gainsay.

The evidence also shows that just prior to the disclosure and development of Sloan's Butterfly Valve, Mudco held the exclusive distributorship on two of Sloan's patented inventions. Both of these inventions had to do with mud control systems, one being a "mudcrator" which mixed the mud, the other being a "drill pipe mud control" which controlled the flow of mud in the drill pipe.[35] Under such circumstances Sloan's attorney had an oral understanding with Albert, Mudco's president, that Sloan was to be protected and would share in any profits realized from discoveries of Sloan which proved of commercial value.[36]

As late as December 1949 when Mudco's officials first approached Sloan regarding a reduction in royalty payment the defendant at the outset did not suggest that Sloan was not entitled to some royalty.[37]

The evidence, taken in its entirety, discloses that Mudco received and then exploited Sloan's Butterfly Valve as adapted to control drilling mud under circumstances which indicated that Sloan would share with Mudco any profit realized by Mudco in the use of Sloan's idea.[38]

The defendant in the instant case is in a position analogous to that of the defendant in Saco-Lowell Shops v. Reynolds [39] wherein Judge Parker said:

"The liability of defendant here is not to be determined as upon a charge of patent infringement nor even as in the case of an ordinary licensee under contract for the payment of royalties, for the reason that the J frames upon which royalties are claimed embody *not only the fundamental ideas* embodied in the Reynolds invention but also a specific application of those ideas evolved by Reynolds himself and communicated to defendant because of the confidential relationship into which the parties had entered for the development of the invention. In other words, defendant is not an independent manufacturer, nor is it a mere licensee manufacturing a machine obtained from an independent source. *It is a licensee who was working with Reynolds in the joint enterprise of developing his machine for the market, and who brought out a machine based upon ideas which he conceived and*

35. See note 5, paragraph 1. Cf. note 26, paragraph 2.

36. Poe testified that prior to the development of Sloan's Butterfly Valve, Albert told him that inasmuch as Mudco was selling Sloan's mudcrator, and that a deal had been worked out on the "drill pipe mud control" all of which would be profitable to all concerned, due to co-operation between the parties that Albert thought Mudco should have first look-see at any new ideas or devices of Sloan. Poe stated he answered, " 'Well now, Dick, that's just fine, but a lot of these ideas are not fully developed when he [Sloan] comes to me with them. Some of them might not even be patentable, and *all I want is an understanding that between the three of us, that if we are ever able to make anything out of these*

*gadgets and inventions and ideas of Sloan's and that Sloan is going to be protected and have some participation in it and some agreement will be entered into.'* And that was the understanding between Dick and Sloan and I through this period of time, after this exclusive distributorship of June 14, 1948." (Emphasis supplied.) (R. 59, 60.)

37. See (PX 15) and (R. 66, Poe).

38. The working agreement tendered by the defendant to the original manufacturer stated, among other things, that "Patent royalties will be paid by Mud Products, Inc., directly to Mr. J. I. Sloan." (PX 23.)

39. 4 Cir., 1944, 141 F.2d 587, 597. Cf. Hoeltke v. C. M. Kemp Mfg. Co., 4 Cir., 1935, 80 F.2d 912 at page 923.

*which he communicated in aid of the joint enterprise. There can be no question but that defendant is liable for royalties on the machines embodying Reynolds' idea so communicated, quite irrespective of patent coverage or the terms of the license contract."* (Emphasis supplied.)

In Baker Oil Tools v. Burch,[40] a case somewhat analogous to the instant case but involving a patent right as distinguished from mere discovery, Judge McDermott made the following observation:

"In equity and good conscience, Burch is entitled to any protection afforded by Baker patent, 1,748,007. The ball valve in a cement plug idea was Burch's, and not Mr. Baker's; Mr. Baker had applied for a patent for a casing shoe a few weeks before he met Burch, along the old idea of a poppet valve in a metal plug. He met Burch, was shown the drawings and a sample embodying the new idea, and took it over under an agreement, implied if not express, to eliminate objections that might stand between the sample and a practical device for the trade. More than that, he asked that counsel of his selection should be engaged by Burch to get broad patent protection for Burch. By so doing, Baker became more than a bare licensee; the confidence and trust reposed in Baker and its patent counsel by Burch, Baker's acceptance thereof, and the agreement then made to improve the device, later carried out, created a fiduciary relationship between them. On well settled principles, Baker cannot turn that relationship to its personal profit by an appropriation of the fruits of the relationship. * * * Judge Hare, in his note to 1 Leading Cases in Equity, 62, lays down this rule, applicable here:

" 'Wherever one person is placed in such relation to another, by the act or consent of that other, or in the act of a third person, or the law, that he becomes interested for him, or interested with him in any subject of property or business, he is prohibited from acquiring rights in that subject antagonistic to the person with whose interest he has become associated.' "

Although in the case at bar we are dealing with discovery as distinguished from invention, the governing principle of law gives to the discoverer the same protection given the inventor where the discovered idea was disclosed in confidence.[41]

## V
### Conclusion

The Court is of the opinion that Sloan disclosed to the defendant company a novel adaptation of the butterfly valve to control drilling mud; this disclosure was made under such conditions as to create in Sloan, as between the parties, a common law property right. Although in retrospect the presented idea may appear simple in character,[42] it would be unconscionable to

40. 10 Cir., 1934, 71 F.2d 31, 36.

41. "To entitle one to a patent, there must be invention. The applicant must have exercised some degree of ingenuity, displayed some flash of genius, inspiration, or imagination not within the reach of mere artisanship. * * * A process may, however, be maintained in secrecy and be entitled to equitable protection even though invention is not present. The cases which deal with the elements necessarily present in a proprietary process are careful to define such processes as resulting from invention, or discovery. [Citing cases.] Quite clearly discovery is something less than invention. Invention requires genius, imagination, inspiration, or whatever is the faculty that gives birth to the inventive concept. Discovery may be the result of industry, application, or be perhaps merely fortuitous. *The discoverer, however, is entitled to the same protection as the inventor."* (Emphasis supplied.) A. O. Smith Corporation v. Petroleum Iron Works Co., 6 Cir., 1934, 73 F.2d 531, 538. Petition for rehearing denied in first case, and former opinion corrected in the second case, 6 Cir., 74 F.2d 934. Cf. American Dirigold Corp. v. Dirigold Metals Corp., 6 Cir., 1949, 125 F.2d 446, at page 452.

42. "The mere fact that the means by which a discovery is made are obvious, that experimentation which leads from known factors to an ascertainable but

permit the defendant company, primarily a sales organization, to breach a fiduciary relationship and capitalize upon a mechanical discovery originating in the mind of Sloan, admittedly a man of considerable mechanical versatility.

The written contracts which were submitted into evidence were a perfectly proper means to determine the amount Sloan was to receive for the use of his property right. If the contracts had provided for an outright sale of the property right or had specifically stated that upon the termination of the final contract Mudco was free to manufacture and sell the valves without further royalty liability, the plaintiffs' rights would have ceased upon cancellation of the contract. However, the final contract only determined the amount of royalty to be paid for the use of the butterfly valve during the time covered by the agreement; by the defendant's own evidence the final contract did not pretend to settle the dispute between the parties regarding Mudco's legal right to sell the valve in connection with mud control without further royalty payment subsequent to the contract's termination.

In the absence of an express contract divesting the plaintiffs of Sloan's proprietary interest, plaintiffs are entitled to have a share in the realized proceeds of the property right in question so long as it is exploited by Mudco.

At this time the Court will not rule upon the express relief to be granted the plaintiffs. Further proceedings must be held to determine the exact extent to which the novel adaptation of the butterfly valve to mud control is being exploited by the defendant company. The plaintiffs have no monetary interest in any Mudco Butterfly Valves being sold by Mudco for purposes other than to be used to control drilling mud, inasmuch as the property right of plaintiffs rests not in the butterfly valve but in the novel application of the valve to mud control systems. Although such an accounting will present certain practical difficulties equity requires just such a determination.

■ The plaintiffs are entitled to a reasonable royalty [43] on all Mudco Butterfly Valves manufactured and sold to be used to control drilling mud from the expiration date of the final contract up through the date of the final accounting, together with either a reasonable royalty for future sales of Mudco Butterfly Valves used in mud control, or an injunction against the defendant prohibiting further manufacture and sale of Mudco Butterfly Valves in connection with mud control.[44]

presently unknown result may be simple, we think cannot destroy the value of the discovery to one who makes it, or advantage the competitor who by unfair means, or as the beneficiary of a broken faith, obtains the desired knowledge without himself paying the price in labor, money, or machines expended by the discoverer. Facts of great value may, like the lost purse upon the highway, lie long unnoticed upon the public commons. Hundreds pass them by, till one more observant than the rest makes discovery. It is idle to say that, in the eyes of the law, interest may not in such case follow discernment. * * *" A. O. Smith Corporation v. Petroleum Iron Works Co., note 41, supra, 73 F.2d at pages 538, 539.

Even so the quality of Sloan's idea should not be underrated. Defendant's witness Leroux, who qualified as an ex-

pert on mud systems, when asked upon cross-examination whether per chance he had originally thought of using the butterfly valve in mud control, modestly but hastily said, "No, I'm not that smart. I didn't do that." (R. 200.)

43. As mentioned in 170 A.L.R. 449, 494, "Royalties, strictly speaking, being the product of contract, do not ordinarily apply to the case of a use or manufacture without consent. But where there is a general contract for use or manufacture and defendant appropriates a particular invention as not within the contract, a finding against him may entail royalty payments." See Saco-Lowell Shops v. Reynolds, 4 Cir., 1944, 141 F.2d 587.

44. Attached hereto and designated as part VI are 11 specific findings of fact which are hereby incorporated by reference into this opinion.